## THE LOUISIANA INSURANCE COMPANY vs. MORGAN, SHERIFF, AND GARDERE, TREASURER.

APPEAL from the court of the fourth district,

PORTER, J. delivered the opinion of the court. By an act of the legislature approved the 27th of March, 1813, an annual tax of twenty-five cents, is imposed on every $100 of the stock in trade of banks, insurance, and other incorporated companies.

The stock of the company who are plaintiffs in this suit, is divided into 300 shares, of $1000 each, one tenth of which has been paid in, and securities taken for the remaining nine-tenths, pursuant to the first section of the act of incorporation.

The treasurer of the state, acting under the advice of the attorney general, conceived that the company should pay this tax, not only on the sum which the stockholders had

A tax levied on the stock in trade of an insurance company, extends to capital secured as well as paid in.

The oath of the president and directors. is not conclusive as to the amount of stock.

paid in, but on that which they had furnished security to pay, and the company refusing to acquiesce in this construction of the law, he issued a writ of seizure, to compel them.— This writ they enjoined, and the proceedings which followed, form the case now presented for our decision.

The judge below, after hearing the testimony, and the arguments offered on it, made the injunction perpetual. The state appealed.

From the facts established on the trial, it appears, that up to the present time, the treasurer has been accustomed to demand nothing more, than the sum due to the state on the amount of the capital stock paid in. But the attorney general urges it was through error, this construction was given to the act, imposing a tax on the stock of the company, and insists the state has not only a right to claim the tax for the past year, according to the interpretation which she now puts on the law, but also the arrearages which would be due on the former payments, if that interpretation be correct. The order of seizure, enjoined, issued for both.

It was admitted, that the president of the company, declared, to the state treasurer, that the capital stock of said company, was all subscribed, that one-tenth of it was paid in cash, and the remaining nine-tenths of it secured.

The first objection made to the present claim, on behalf of the state, is derived from the 36th section of the act of the legislature, imposing the tax. It provides, "That the treasurer of the state shall be, and is hereby authorised, to demand from the president and directors of banks, insurance, or other incorporated commercial companies, by writing, and under oath, a declaration of the amount of their stock in trade; and from these declarations, he, the said treasurer, shall establish the amount of the tax, due by each of the said incorporated banks, insurance, or other commercial companies; and the said president and directors of such companies, shall be bound to pay the said tax, quarterly, into the hands of the state treasurer," &c. &c.

That the state might, in levying a tax, think proper to consider, and so enact, that the oath of the party interested in diminishing it, should be conclusive as to the amount due,

cannot be called in question. But a clear and unequivocal declaration of their intention, would be necessary, to justify such a conclusion. The very existence of legislation, and the necessity for laws of any kind, rest on a presumption of feelings in our nature, and motives of action governing men, totally opposed to such a construction. We do not recollect a single instance, in any statute, by which duties were imposed, or obligations created, that the right of furnishing evidence, which would be conclusive as to their being correctly discharged, is conferred on the party burthened by them. It would be well, if this could be safely done. But in all these cases, law makers presume, that there may be fraud; that with the purest intentions, there may be error; and that the delusions of self-love, render it as unsafe to trust men with power over the proof, as it would be to permit them to sit in judgment, and decide their own case.

Our legislature was not so imprudent, as the argument addressed to us on this subject supposes. By the latter part of the section relied on, it is provided, " that in case of negligence or refusal of the president and di-

rectors of the above mentioned companies, to make a *fair* declaration of the stock in trade, in the manner prescribed by this act, they shall be liable to pay a double tax," &c.

We have seen, that it is not from negligence or refusal to make *any return*, but from negligence or refusal to make a *fair one*, that the penalty is incurred. That the legislature intended this penalty to follow an unfair return, as well as making none at all, is evident, from their annexing a condition to it; for whether it was fair. or not, could only be ascertained after it was examined. It is equally clear, they did not understand the declaration was to be taken as conclusive, for if they had so contemplated, the requiring it to be a fair one, was vain and nugatory.— Why impose a penalty for an unfair return, if every return was to be taken as fair? Why require the declaration of the president and directors to be made in a particular manner, if that declaration, no matter how contrary to the manner prescribed, was to be evidence, and conclusive evidence too, of its being given in the mode required by the statute?

We have been unable to find any satisfactory answers to these questions; and even if

L. I. Ccmpany.
*vs.*
Morgan & al.

we had found them, the present case would not authorise the application of the doctrine on which the appellees rely. The statement of facts, contains an admission, "that the president of the Louisiana Insurance Company, declared, to the state treasurer, that the capital stock of said company, was all subscribed, that one-tenth of it was paid in cash, and the remaining nine-tenths secured."— This declaration does not confine *the stock in trade*, to the amount paid in. It states the facts, in relation to the mode the stock is held, and leaves the inference to be drawn, whether all, or part of it, is to be considered as the stock on which the company is trading. This statement, if it be different from the terms used in the treasurer's receipt, as making a part of the admissions of the parties, on record, controuls it.

This objection disposed of, we are required to examine the case on what may be properly called its merits.

The clause in the act of our legislature, on which this contest has arisen, is in the following words:

"Stocks of all banks, insurance, and other incorporated commercial companies, estab-

lished, or to be established in this state, by any authority whatever, shall, after the passage of this act, be liable to an annual tax of twenty-five cents, on every hundred dollars of their stock in trade, to be collected as prescribed by this act.

The decision of the case, therefore, turns on the correct interpreation to be given to these expressions in the law, *stock in trade* It would appear to lie in a narrow compass, and yet the discussion has extended far and wide, in search of the meaning of these terms.

The intention of the legislature is to be collected from the whole context of the act, in which the passage already cited is found; from that of the act incorporating the company; from the literal meaning of the language; and from the meaning which should be attached to that language, when used in relation to the subject matter.

We shall first consider it under the means which the acts themselves afford, for obtaining a correct knowledge of the meanig of the law maker.

The act incorporating the company who are plaintiff's in this suit, by its first section,

among other things, provides, " that the capital stock of the said corporation, shall not exceed the sum of $ 300,000, divided into 300 shares of $ 1000 each; to be paid, one tenth part at the time of subscribing, either in money, or in bank notes of any of the banks established in New Orleans; the remaining nine-tenths, by such instalments as the directors, hereinafter mentioned, shall appoint. *Provided, however*, That the first board of directors to be chosen, as herein after directed, shall within one month after their appointment, take good and satisfactory security, to consist either in bank, or other stock. or mortgages on real estates, for the payment of the remaining nine-tenths, whenever it shall be deemed expedient to call for the same; and in case of losses accruing to the said company, the stock-holders shall in no case be liable, or in any way answerable, for more than the amount of their respective shares."

The 14th section declares that "no insurance shall be made by the said corporation, until the several securities, to be taken for the nine-tenths of the said capital stock, shall have been received by the directors of said company.

Under these provisions, the company say, *their only stock in trade*, is the one tenth paid in; and yet the act of incorporation says, they shall make no insurance, that is, *they shall not trade at all*, until the one tenth is paid, and the remaining nine-tenths secured. If then the capital paid in, is alone *the stock in trade*, we are forced to conclude that it was the intention of the legislature, the company should *not* do business on their stock in trade, but that they might do it on that, which, according to the argument now used, is not a part of their stock in trade.

A construction which at once carries us to such strange consequences, certainly requires no particular refutation from the court. Unless the company has violated its charter, the position it now assumes, must be untrue. It is prohibited from making any insurance on the one tenth of the stock paid in. It then follows, that it must have either not complied with the conditions on which it was incorporated, or that it has done business on the capital paid in, and something else. If there were any thing more than the $ 30,000, the declaration of the directors and president, have been made in error since the first pay-

ment of the tax.   We are left in no doubt, as to what formed the addition to the money paid in, and on which the appellees have been doing business.   It was the securities obtained for the payment of the nine-tenths of the stock, for without them, the company were prohibited from making any insurance, whatever.

Supposing us without this strong and unequivocal expression of the understanding of the legislature, and that we were compelled to decide the case alone on the meaning of the words used, would there be any more difficulty? We think not.   The terms, *stock in trade*, mean the capital on which the company transacts its business—that which it uses to accomplish the purpose for which it was formed.   The attempt to restrain the capital to the amount of cash paid in by the partners, is to us of the first impression. We are unable to see why it should be so limited.   Stock may consist of other things, on which, either an individual or a company, may trade as surely, and perhaps as successfully, as on money.   In the case of an ordinary partnership, where all the members of the firm but one, had contributed a cer-

ain sum, for the formation of a common stock, and that one gave his obligation to pay his share when called on, could it be doubted, that the debt thus due by the individual partner, would not make a part of the stock in trade of the company? We should suppose not. *La. Code*, 2779. The case before us is stronger. This association was formed alone for the purpose of effecting insurance. It's business, unlike that of a bank, was not to lend out money. Its transactions produce only a responsibility depending on contingencies. It may trade for a long time without disbursing a dollar, except for ordinary expenses. All that it requires to enable it to do do business, is to inspire the public with confidence in its integrity and capacity to meet any losses for which it may become liable. Under such circumstances, where the security furnished by the stockholders, to pay whenever the necessities of the corporation may require it, enables that corporation to insure with the same freedom, and to the same extent, as if the cash was in their vaults; there is not a shadow of reason, for distinguishing between that part of the stock which is secured, and that which is paid in.

Both are the stock *in trade*, because both are the stock on which the company *does trade* both serve the same purposes: both contribute to the production of profits. It is not pretended the company has restrained its operations to the amount paid in. It has not been shown that the securities it has obtained from the stockholders, do not enable it to make insurances to the whole amount secured. In the absence of any proof, we are bound to presume from the nature of the business, that the unpaid part of the stock, enables the company to do so, and it cannot be doubted that its operations are conducted in reference to them. When to these considerations, we add those drawn from the act of incorporation we feel compelled to state, that we think the claim set up by the appellees, to be wholly without foundation.

It is the strong conviction of the error in which the company, and the former officers of the state have fallen, that prevents us from giving that weight to the interpretation long put on the act, which the judge of the first instance considered his duty to do. The state is not bound by the error of one its officers. It is not placed beyond the pr

Eastern District.
February, 1830.

L. I. COMPANY.
vs.
MORGAN & AL.

tection of its own law, that where there has been a mistake, there exists a remedy to rectify it. Much stress has been laid on the accounts of the treasurer being annually submitted to the examination of a committee of the legislature ; the report of that committee to both houses ; and their acquiescence in the construction given to the law by the treasurer, from no steps having been taken to correct his error. This argument is entitled to some weight, but not to all that which was given to it. We cannot shut our eyes as to the manner these things are done. The committee who examine the accounts of the treasurer do not report the details of them to the legislature. So that it is only the presumption of their acquiescence, and not that of both branches of the legislature, which can be invoked. It is only theirs, too, without its being shown their attention was ever drawn to the matter under consideration. It rarely happens, we apprehend, that the gentlemen charged with that duty, take the statute book in hand, to see whether the collecting officers have properly interpreted the laws imposing taxes. Special circumstances may make them do so in some cases. Generally, we be-

lieve their principal attention is directed to see that all the money received, is accounted for. A point which has passed *sub silentio* in courts of justice, is justly entitled to little consideration, in establishing a legal principle. The silence of a committee of the legislature, is not worthy of much more, when invoked as a guide for a judicial decision. It might make some weight in the balance of a doubtful case. It can effect but little, the scales of a clear one.

It has been contended, that the terms used in the French text of the law, namely, *chaque cent piastres effectives* are different from those used in the English, *every hundred dollars of their stock*, *used in trade*, or at least show the propriety of restricting them to the capital paid in. The literal translation of the French words just quoted, would be, *every one hundred dollars that are effective*. We believe, that every $100 of the capital, secured, as directed by the charter, are as effective in the hands of the president and directors, as the same sum paid in, and we do not, therefore, see, how the appellee's case is strengthened by the argument drawn from this source.

A great deal has been said on the term *stock*, used in the first part of the section imposing this tax; and those of *stock in trade*, employed in the latter part of the section, to designate, on what portion of that stock the tax should be levied. They meant, it is said, something different, and they can only mean that for which the appellees contend; becase there can be no stock until it is subscribed for, and after it is subscribed, it admits of no other division, than that of capital paid in, and capital secured.

We see no difficulty in this; it is true there can be no stock until it is subscribed; but after subscribing for, it may not be in trade. It may be swallowed up by losses, and though in the charter of incorporation, the directors are prohibited, on such an event, to make any dividend until the stock is restored; yet, until that is done, the company are trading on less than the stock subscribed for. The provision of the law, making the tax depend on the capital used, not on that subscribed, was wise and equitable. And as the amount must fluctuate. the oath of the president and directors was required to ascertain it.

*Eastern District.*
*March, 1830.*

L. I. COMPANY.
*vs.*
MORGAN & AL.

The plea of prescription is disposed of, by the law of the 29th title of the 3d Partidas, which was in force to the year 1828.

It is therefore ordered, adjudged and decreed, that the judgment of the parish court be annulled, avoided and reversed; that the injunction granted in the case be dissolved, and that the appelles pay costs in both courts.

*Maybin* for plaintiffs, *Morphy*, Attorney General, for defendants.